WILLIAM L. SCARBOROUGH, FOR HIMSELF AND ON BEHALF OF ANY OTHER RESIDENTS AND TAXPAYERS OF THE "METROPOLITAN SEWERAGE DISTRICT OF BUNCOMBE COUNTY" WHO MAY BE INTERESTED AND DESIROUS TO MAKE THEMSELVES PARTIES PLAINTIFF v. J. G. ADAMS, JR., J. W. SPICER, GEORGE E. DAWSON, J. R. REAGAN, RONALD E. FINCH, MYRON PETERSON, OSCAR TANDY, MRS. ROBERT M. SWICEGOOD, C. LeROY ROBINSON AND T. S. GARRISON, SR., MEMBERS OF THE DISTRICT BOARD OF THE "METROPOLITAN SEWERAGE DISTRICT OF BUNCOMBE COUNTY," AND "METROPOLITAN SEWERAGE DISTRICT OF BUNCOMBE COUNTY."

(Filed 18 June, 1965.)

1. **Sanitary Districts § 1; Constitutional Law §§ 17, 24— Creation of metropolitan district comprised of sanitary districts and municipalities held valid.**

The statutes specifically authorize the creation of a metropolitan sanitary district comprised of other sanitary districts and municipalities, and the creation of such district upon the vote of the governing bodies of the constituent municipalities and districts, without a vote of the respective inhabitents, does not violate either section 1 or section 17 of Article I of the State Constitution, since even though a vote of the majority of the freeholders of any unincorporated area is required to create a district, G.S. 130-124, the constituent districts were presumably created by petition signed

by 51 per cent of their respective freeholders, and the governing bodies have power to act for the respective districts and municipalities. G.S. 153-295 et seq., G.S. 143-215.2(e)(f).

**2. Same—**

The fact that one of the sanitary districts included in a metropolitan district does not have a sewerage system at the time of the creation of the metropolitan district does not preclude its inclusion in the district, since it may thereafter construct such system or the metropolitan district may construct a system for it. G.S. 153-300(5).

**3. Contracts § 12—**

Where no time is fixed for the termination of a contract it will continue for a reasonable time, taking into account the purposes the parties intended to accomplish.

**4. Contracts § 6; Municipal Corporations § 17; Sanitary Districts § 1—.**

The fact that a contract between a metropolitan district and the municipalities and sanitary districts within its boundaries in regard to the operation, control, and financing of the metropolitan sanitary district provides that the contract should continue in force so long as the district's disposal system remains in existence and operation, is valid and is not against public policy, since the very nature and exigencies of the problem require contracts continuing for an indefinite time.

**5. Sanitary Districts § 2—**

The provisions of a contract between a metropolitan sanitary district and the municipalities and sanitary districts within its boundaries that the metropolitan district should have authority to cut-off water to users who are delinquent in their sewerage account is valid. G.S. 153-317(2)(c).

**6. Counties § 5—**

G.S. 153-324 expressly provides that all general or special laws inconsistent therewith are inapplicable, and G.S. 153-310 specifically permits the bond resolution of a sanitary district to contain provisions for the use and disposition of the revenues of the system and the creation and maintenance of reserves and sinking funds, and therefore the provisions of Ch. 4 Public-Local Laws of 1937 that the Sinking Fund Commission of Buncombe County should have custody and management of the sinking, revolving or other funds for the payment or retirement of bonded indebtedness is not applicable to the bonds of a metropolitan sanitary district.

APPEAL by plaintiff from McLean, J., January 25, 1965 Regular Session, BUNCOMBE Superior Court.

The plaintiff, for himself and for other residents and taxpayers of the Metropolitan Sewerage District of Buncombe County similarly situated, instituted this civil action against the Metropolitan Sewerage District of Buncombe County and the ten individual members of the Metropolitan Sewerage District Board for the purpose of enjoining and restraining all defendants, their agents, etc., from issuing, offering for sale,

or selling bonds and notes not to exceed Ten Million, Four Hundred Thousand Dollars ($10,400,000.00) pursuant to the authority conferred by G.S. 153-295 to 324, inclusive, and as ordered by Bond Resolution dated September 25, 1964, and approved at the election held in the district on December 14, 1963.

The plaintiff alleges:

"(T)hat the Board of County Commissioners of Buncombe County, in conjunction with the State Stream Sanitation Committee, acting under and pursuant to the authority purported to be granted to them by Chapter 795 of the Act of the 1961 General Assembly of North Carolina, attempted to create the Metropolitan Sewerage District of Buncombe County . . . being comprised of the following political subdivisions located within Buncombe County, namely: City of Asheville, Town of Biltmore Forest, Town of Weaverville, Town of Black Mountain, Woodfin Sanitary Water and Sewer District, Busbee Sanitary Sewer District, Crescent Hill Sanitary Sewer District, Skyland Sanitary Sewer District, Fairview Sanitary Sewer District, East Biltmore Sanitary Sewer District, Caney Valley Sanitary Sewer District, Swannanoa Water and Sewer District, Beaverdam Water and Sewer District, Venable Sanitary District.

"The plaintiff is advised, informed and believes that the Act under which the Metropolitan Sewerage District of Buncombe County purports to have been created, authorizes and empowers said District to do, among other things, the following:

"(a)   To acquire, lease as lessor or lessee, construct, reconstruct, improve, extend, enlarge, equip, repair, maintain and operate any sewerage system or part thereof within or without the District, the term 'sewerage system' embracing both sewers (as defined in said Act) and sewage disposal systems (as defined in said Act) and any part or parts thereof, either within or without the limits of the District, all property, rights, easements and franchises relating thereto, and any and all buildings and other structures necessary or useful in connection with the ownership, operation or maintenance thereof;

"(b)   To issue its general obligation bonds or revenue bonds for the purpose of providing funds for paying all or any part of the cost of a sewerage system or systems;

"(c)   To fix and revise from time to time and to collect rents, rates, fees and other charges for the use of or for the services and facilities furnished by any sewerage system;

"(d)   To secure any general obligation bonds of the District by a pledge of the revenues of any sewerage system;

"(e)   To levy and collect annually a tax *ad valorem* upon all the taxable property in the District sufficient to pay the interest on and the principal of any such general obligation bonds as such interest and principal become due; provided, however, that such tax may be reduced by the amount of other moneys actually available for such purpose;

"(f)   To make and enter into contracts or agreements with the governing bodies of any political subdivisions upon such terms and conditions and for such periods as any such governing body and the District Board of the District (hereinafter sometimes called the 'District Board') may determine with respect to:

"(i)   The collection, treatment and disposal of sewage;

"(ii)   The collecting by such political subdivision or by the District of rents, rates, fees or charges for the services and facilities provided to or for such political subdivision or its inhabitants by any sewerage system, and for the enforcement of collection of such rents, rates, fees and charges; and

"(iii)   The imposition of penalties, including the shutting off of the supply of water furnished by any water system owned or operated by any such political subdivision, in the event that the owner, tenant or occupant of any premises utilizing such water shall fail to pay any such rents, rates, fees or charges.

"4.   That the defendants, pursuant to the purported authority in them vested, have caused their Consulting Engineers to make an investigation and to file report, together with said Engineers' recommendations as to the type of sewerage disposal system that will be adequate to accommodate the needs of the purported district, which includes the fourteen political subdivisions hereinbefore named in paragraph two, and the said Engineers have recommended and the District has estimated and found that a sewage disposal system which will be adequate to accommodate the needs of the purported district will cost approximately $10,400,000.00 to construct and place in operation, and the said District has estimated and purports to have found that the estimated cost of constructing a Metropolitan Sewerage Disposal System to serve the District, which includes the fourteen political subdivisions located in Buncombe County, hereinbefore named in paragraph two of this complaint, would be less than the aggregate cost of constructing individual sewage disposal systems to serve the fourteen var-

ious political subdivisions which are embraced in and comprise the purported District.

"5.   That an election was held in the purported District on December 14, 1963, and a majority of the qualified voters voting in said election approved a bond order adopted by the District Board on October 8, 1963, which bond order, among other things, purported to authorize the issuance of not exceeding $10,400,000.00 sewage disposal system bonds of the District for the purpose of providing funds in addition to any other available funds for constructing a sewage disposal system for the District, including treatment plants, pumping stations, intercepting sewers, trunk sewers, pressure lines, mains and all other necessary appurtenances, equipment and apparatus, together with real property, rights, easements, franchises and any and every kind of property necessary and incident to the building, installation and maintaining collectively a sewerage disposal system and authorizing the levying and collecting a tax for the payment thereof.

"6.   The plaintiff is advised, informed and believes, and on such information and belief, alleges that the District has done or caused to be done all those things required by the Act of the 1961 General Assembly, Chapter 795, and are now about to execute, sell and deliver general obligation bonds of the District in the aggregate amount of $10,400,000.00, and if the said bonds are sold and delivered they will, among other things, as provided therein and as provided by the Bond Order adopted by the District Board on October 8, 1963, irrevocably pledge for the prompt payment thereof, both principal and interest as the same become due, the full faith and credit of said 'Metropolitan Sewerage District of Buncombe County' and said bonds will be general obligation bonds of the District."

The plaintiff further alleged:

"(T)hat on or about September 1, 1964, the Metropolitan Sewerage District of Buncombe County entered into fourteen separate agreements with the fourteen separate political subdivisions named in paragraph two of this complaint. That, among other things, it was agreed between the Metropolitan District of Buncombe County and each of the fourteen political subdivisions, as follows:

"The District will use its best efforts to consummate the sale of its bonds at the earliest practicable date in an aggregate principal amount sufficient to pay the cost of constructing and placing in

operation the sewage disposal system recommended in the Engineering Report such sewage disposal system being hereinafter called the 'Sewage Disposal System.' "

The parties waived a jury trial and stipulated that Judge McLean should hear the evidence and decide the entire controversy. Among other findings, Judge McLean made the following:

"9. That the defendants, pursuant to the authority in them vested, have caused their Consulting Engineers to make an investigation and file report, together with Engineers' recommendations as to the type of sewage disposal system that will be adequate to accommodate the needs of the district, which includes the fourteen political subdivisions named in paragraph two of the complaint, and the said Engineers have recommended and the District has estimated and found that a sewage disposal system which will be adequate to accommodate the needs of the district will cost approximately $10,400,000.00 to construct and place in operation, and the said District has estimated and has found that the estimated cost of constructing a Metropolitan Sewerage Disposal System to serve the District, which includes the fourteen political subdivisions located in Buncombe County, named in paragraph two of the plaintiff's complaint, would be less than the aggregate cost of constructing individual sewage disposal systems to serve the fourteen various political subdivisions which are embraced in and comprise the District, a copy of said Consulting Engineers' investigation and report having been appended to the Agreed Statement of Facts, and, in its entirety, is made a part of this Finding of Fact.

"10. That an election was held in the District on December 14, 1963, and a majority of the qualified voters voting in said election approved a bond order adopted by the District Board on October 8, 1963, which bond order, among other things, authorized the issuance of not exceeding $10,400,000.00 sewage disposal system bonds of the District for the purpose of providing funds in addition to any other available funds for constructing a sewage disposal system for the District, including treatment plants, pumping stations, intercepting sewers, trunk sewers, pressure lines, mains and all other necessary appurtenances, equipment and apparatus, together with real property, rights, easements, franchises and any and every kind of property necessary and incident to the building, installation and maintaining collectively a sewer disposal system and authorizing and levying and collecting a tax for the payment thereof.

"11. That the District and District Board have done or caused to be done all those things required by the Act of the 1961 General Assembly, Chapter 795, and are now about to execute, sell and deliver general obligation bonds of the District in the aggregate amount of $10,400,000.00, and if the said bonds are sold and delivered they will, among other things, as provided therein and as provided by the Bond Order adopted by the District Board on October 8, 1963, irrevocably pledge for the prompt payment thereof, both principal and interest, as the same become due, the full faith and credit of said Metropolitan Sewerage District of Buncombe County, and said bonds will be general obligation bonds of the District." * * *

"14. That if any bonds are ever issued by the Metropolitan Sewerage District of Buncombe County, the Trustee named by the District in the bond resolution of September 25, 1964, will have custody, application of proceeds of bonds, the supervision and management of the funds of the District available for the payment of the District Bonds, and the management of the funds in every respect, and the management of the funds of the District will in no way or manner be under the supervision of the Buncombe County Sinking Fund Commission, as the same was established in 1937 and is now in full force and effect as provided by said Act."

The plaintiff challenges the validity of the Bond Resolution upon five grounds:

1. The method by which the Metropolitan Sewerage District was created violates Section 1 and Section 17 of Article I, North Carolina Constitution in that it included within the overall district the fourteen political subdivisions by resolutions of their governing boards without the joinder of the residents of the subdivision.

2. The inclusion of the Venable Sanitary District which has no public sewerage system violates the sections of the Constitution above referred to.

3. The agreements between the Metropolitan District and the fourteen subdivisions are against public policy in that they provide that the agreement shall continue so long as the sewerage district systems remain in existence and operation.

4. That part of the agreement between the Metropolitan District and each subdivision that the latter during default will discontinue furnishing water to the users whose sewage disposal service charges are delinquent is invalid.

5. The provision of the Bond Resolution that a trustee shall have custody, supervision, and management of the fund provided for the payment of bonds violates Section 9, Chapter 4, Public-Local Laws of 1937 which provides for a Sinking Fund Commission to perform these services.

After finding the facts to be as the parties stipulated, the court concluded:

1. The Metropolitan Sewerage District of Buncombe County was created according to law.

2. The inclusion of the Venable Sanitary District within Metropolitan was authorized by law.

3. Bonds issued pursuant to the Bond Resolution will be valid and binding obligations of the Metropolitan Sewerage District of Buncombe County.

4. The agreements between the fourteen subdivisions and Metropolitan, including the authority to cut off water in default of sewerage dues payment, are valid and binding and not in contravention of the North Carolina Constitution.

5. The provision of the bond resolution and the trust agreement that a trustee shall have custody and management of the District's funds committed to the specific purposes prescribed is valid and that the provisions of Section 9, Chapter 4, Public-Local Laws of 1937, are inapplicable.

The court entered judgment denying the restraining order and dismissing the action. Plaintiff excepted and appealed.

*Loftin & Loftin by E. L. Loftin for plaintiff appellant.*
*Anthony Redmond for defendant appellee.*

HIGGINS, J. The Board of Commissioners of Buncombe County in conjunction with the State Stream Sanitation Committee created in the manner provided by G.S. 153-295 through 324 the Metropolitan Sewerage District of Buncombe County. Prior to the creation, the city, the three towns, and nine of the ten sanitary sewerage districts each maintained its individual sewerage system. The tenth (Venable Sanitary District) did not have "a public sewerage collection system." All of the several systems discharged raw sewage into the French Broad River or into its tributary, Hominy Creek. Many of the discharge outlets emptied into the river within the corporate limits of the City of Asheville. All of the sanitary districts lacked facilities for the treatment of raw sewage. The resulting stream pollution is and has been in

violation of public health laws of the State. However, the State Stream Sanitation Committee, on a temporary basis, has permitted the pollution to continue, pending the arrangements herein contemplated.

To remove the health hazard resulting from pollution, the State Stream Sanitation Committee and the fourteen sanitary districts initiated the proceeding before the Board of County Commissioners for the creation of the Metropolitan District. Confronted, as they were, with the necessity of complying with the health laws by treating the sewage before its discharge into the river, and realizing the enormous cost to each unit if required to furnish a separate treatment facility, the several units, through their governing bodies, petitioned the Board of Commissioners for the creation of the Metropolitan District in order that they might pool their resources and create one unit to handle the problem for all. These constituent units contracted with the Metropolitan District as to their respective rights, duties, and obligations under which the contracting parties shall discharge the contract obligations which are to become effective only upon the sale of the Metropolitan District bonds authorized by the bond resolution.

The plan herein followed for dealing with the pollution problem is specifically authorized by law. G.S. 143-215.2(e) and (f) provides: "It is the intent of this section, however, that the Committee shall seek to obtain the co-operative effort of all persons contributing to each situation involving pollution in remedying such situation, and that the powers granted by this section shall be exercised only when the objective of this section cannot be otherwise achieved within a reasonable time. . . .

"When an order of the Committee to abate discharge of untreated or inadequately treated sewage and other waste is served upon a municipality or upon a sanitary district, the governing board of such municipality or the sanitary district board of such district shall, unless said order be reversed on appeal, proceed to provide funds, using any or all means necessary and available . . . by issuance of bonds secured by the full faith and credit of such municipality or district or by issuance of revenue bonds or otherwise, for financing the cost of all things necessary for full compliance with said order and shall thereby comply with said order. . . ."

The foregoing is a summary of the factual background as shown by the record before us. Untenable is the objection that the creation of the Metropolitan District is invalid as violative of Sections 1 and 17 (the inalienable rights and the law of the land guarantees) of Article I of the North Carolina Constitution. The Metropolitan District was created pursuant to petition filed by the governing bodies of the city, towns, and the ten sanitary districts without the joinder of any of the

residents of the subdivision. G.S. 153-297 provides for the creation of the district upon the petition of two or more political subdivisions, or any political subdivision and any unincorporated areas by the resolution of the governing body of a political subdivision, or "If any unincorporated area is to be included in such district, a petition, signed by not less than fifty-one per centum (51%) of the freeholders resident within such area, . . ."

Obviously the governing body acts for the subdivision. If there is no subdivision and no governing body to act for the subdivision, a majority of the freeholders must sign the petition. The governing body of each subdivision signed the petition in this case. The Metropolitan District does not include any unincorporated areas. The requirement that fifty-one per centum of the resident freeholders sign the petition (we presume) was met when the Sanitary Districts were created. G.S. 130-124; *Deal v. Sanitary District,* 245 N.C. 74, 95 S.E. 2d 362; *Idol v. Hanes,* 219 N.C. 723, 14 S.E. 2d 801. Hence the constitutional requirements of Article I, Sections 1 and 17, are satisfied.

The inhabitants of the entire area, through their representatives in the manner provided by law, have acted to accomplish that which had to be done, that is: treat the sewage before it entered the only available outlet, the French Broad River. The Legislature has provided machinery for the creation of the governmental agencies necessary to deal with the health hazard incident to stream pollution and has prescribed suitable rules and fixed available standards to govern these agencies in dealing with the problem. These enactments are within legislative competence. They neither violate the inalienable rights nor the law of the land sections of the State Constitution. *Sanitary District v. Lenoir,* 249 N.C. 96, 105 S.E. 2d 411; *Grimesland v. Washington,* 234 N.C. 117, 66 S.E. 2d 794; *Moore v. Board of Education,* 212 N.C. 499, 193 S.E. 732.

Likewise untenable is the plaintiff's contention that the creation of the Metropolitan District violates the constitutional rights of those located in the Venable Sanitary District by taxing them when in fact the Venable District does not have a sewerage system to which Metropolitan may attach its collecting lines. The Venable District, through its representatives, participated in the creation of Metropolitan which embraces all of Venable's territory. The contract obligates Metropolitan to receive and treat sewage for all its constituent members, including Venable, and under the contract must receive sewage from Venable if and when it constructs a system, which it may do at any time. Metropolitan facilities will not be available until there is a sale of the bonds and after its facilities are constructed. In the meantime, Venable may or may not construct needed facilities. The provision that unincor-

porated areas may become a part of the system refutes the contention that a system must be in existence at the time of the creation of Metropolitan. Actually, under the setup, Metropolitan is authorized to "acquire, lease . . . , construct, reconstruct, improve, extend, enlarge, equip, repair, maintain, and operate any sewerage system or part thereof within . . . the district." G.S. 153-300(5). It may be that Metropolitan, under its authority, will construct the needed facilities for the Venable District.

The agreements between the 14 subdivisions and Metropolitan are to continue in force only so long as the district sewerage disposal system remains in existence and in operation, either by the district or by any successor. The agreements provide that each subdivision may use its own or other available disposal facilities to the extent the district fails or is unable to meet the disposal needs of the subdivision. The contracts obligate Metropolitan, for a fixed charge, to pick up raw sewage from the subdivisions' connections and thereafter to transport, convey, treat, and dispose of it. To this end the subdivisions agree to use the services made available by Metropolitan. The General Assembly by G.S. 153-317 authorized the parties to make these contracts. Ordinarily, a valid contract once entered into may not be altered or abrogated except by agreement of the contracting parties. When no time is fixed for the termination of a contract, at least it will continue for a reasonable time, taking into account the purposes the parties intended to accomplish. *Lambeth v. Thomasville,* 179 N.C. 452, 102 S.E. 775; *Plant Food Co. v. Charlotte,* 214 N.C. 518, 199 S.E. 712. The power of the parties to make contracts of this character is discussed by McQuillan on Municipal Corporations, (3rd Ed. Rev. 1964) Vol. 11, Section 31.13:

> "Ordinarily, apart from the authority conferred upon them pertaining to contracts for the construction of public works and improvements generally, including sewers, considered elsewhere in this work, municipalities have power to enter into contracts with respect to their sewer systems. Thus, agreements frequently are entered into with adjoining municipalities or other public bodies, or with private parties, for the mutual development or use of sewerage facilities, upon such considerations, terms and conditions as the parties, acting within the scope of their lawful authorities, deem adequate and politic."

"Authorities, districts, boards, commissions and other supplementary public corporations are widely utilized as effective means for accomplishing the desirable and, in metropolitan areas, the imperative cooperation in the solution of common problems that are typically larger

than the single municipality. The metropolitan authority that takes over a number of the most important municipal functions from all the municipal corporations and townships in a metropolitan area is just coming into its own. . . . Of all the problems facing metropolitan communities requiring joint action and common solutions, that of sewerage and drainage may well be the most important." Antieau, Municipal Corporation Law (1964), Vol. 3, Sec. 28.06, p. 528.

The provision in the contracts between Metropolitan and the 14 subdivisions that the latter will cut off water from users who are delinquent in their sewerage accounts is valid. G.S. 153-317(2)(c) specifically provides for "(T)he shutting off of the supply of water furnished by any water system owned or operated by such political subdivision, in the event that the owner . . . shall fail to pay . . . fees or charges." "Laws authorizing the discontinuance of water services or supplies for nonpayment of sewer charges have been regarded as valid, and as not penal in nature." McQuillin, Municipal Corporations, (3rd Ed. Rev. 1964) Vol. 11, § 31.32(a).

Finally, the appellant challenges the validity of that part of the bond resolution and the trust agreement providing that a trustee shall have the custody, supervision, and management of the funds available for discharging the bonds. The basis of the challenge is the provision of Section 9, Ch. 4, Public-Local Laws of 1937, that the Sinking Fund Commission shall have the custody and management of all sinking, revolving, and other funds earmarked by law or by contract for the payment or retirement of bonded indebtedness of Buncombe County and its subdivisions. This provision of the Public-Local Law is rendered inapplicable to the bonds issued pursuant to the bond resolution here involved. The 1961 Act of the General Assembly, Ch. 795, and G.S. 153-310 provided that any resolution authorizing the issuance of bonds to finance the cost of any sewerage system or any trust agreement securing the bonds may contain the following:

"(2) The use and disposition of the revenues of the sewerage system;

"(3) The creation and maintenance of reserves or sinking funds and the regulation, use and disposition thereof";

The bond resolution and the trust agreement provide that a trustee shall have custody and management of the funds. G.S. 153-324 provides: "All general, special or local laws, or parts thereof, inconsistent herewith are hereby declared to be inapplicable." Hence, the Act of 1961 gives precedence to the bond resolution and the trust agreement and renders Public-Local Law, 1937, inapplicable.

As population increases it becomes manifest that an unpolluted water supply (along with food, clothing, and shelter) is a necessity not only for physical well-being, but as a means of sustaining life. The legislative enactments here involved look to the accomplishment of this end. The Constitution does not interpose any roadblock.

In addition to the assignments of error presented and discussed herein, we have examined the record proper. Error of law does not appear on the face thereof. *Skinner v. Transformadora,* 252 N.C. 320, 113 S.E. 2d 717; *Dare County v. Mater,* 235 N.C. 179, 69 S.E. 2d 244.

The judgment of the Superior Court of Buncombe County is

Affirmed.